I, William R. McDermott, being duly sworn, depose and state the following:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI) assigned to the Northern Virginia Resident Agency of the Washington Field Office. I have been employed by the FBI for approximately three years. I am currently assigned to investigations relating to, among other things, crimes against children, including the sex trafficking of children. I have also received training in prostitution investigations and the sex trafficking of children and have obtained convictions in investigations related to these matters.

2. This affidavit is being submitted in support of a search warrant for the following:

   A. An HP Pavilion, model number, MD Z-D700, P/N, DN730AV and Serial number CNF4381GQ8. The computer is further described in Attachment B.

   B. A Boost Mobile cellular phone, model number H65XAN6RR4BN, serial number 364KGG1YQX. The cellular phone is further described in Attachment B.

3. Based upon my investigation, there is probable cause to believe that LEVAR SIMMS, aka "Var," (hereinafter "SIMMS") and others known and unknown, illegally transported, or caused to be transported, adults and minors

from North Carolina to Washington, D.C., and from Washington, D.C., variously to Virginia and Maryland and back to Washington, D.C., for the purpose of prostitution in violation of 18 U.S.C. §1591.  Further, there is probable cause to believe that, on, about, or between July 15, 2006 and August 14, 2006, SIMMS knowingly persuaded, induced, enticed, and/or coerced one or more individuals to travel in interstate commerce to engage in prostitution in violation of 18 U.S.C. §2422(a).  Additionally, there is probable cause to believe that on, about, or between, July 15, 2006 and August 14, 2006,  SIMMS knowingly transported an individual who had not attained 18 years of age in interstate commerce with the intent that the individual engage in prostitution in violation of 18 U.S.C. § 2243(a).  Moreover, there is probable cause to believe that in, about, or between June and August of 2006, sexually suggestive photographic depictions of a child and/or depictions of sexually explicit conduct of a child were mailed, transported, and shipped in interstate commerce by SIMMS, and were distributed in interstate commerce by SIMMS, in violation of 18 U.S.C. §2252A.  Further, there is probably cause to believe the evidence, fruits, and instrumentalities

of those crimes are located within the residence to be searched.

4.  This affidavit is based on my own investigation and on the investigation of other law enforcement officers with whom I have spoken or whose reports I have received.

5.  The facts set forth in this affidavit do not represent my entire knowledge of this matter.  Rather, the facts set forth are merely for the limited purpose of establishing probable cause.

### Initiation of the Investigation

6.  On August 14, 2006, a 16 year old female runaway from Pennsylvania (hereinafter "L.B.") was discovered at the 7-Eleven store located on the 1900 block of Rhode Island Avenue, Northeast, Washington D.C., after she was stopped by a Metropolitan Police Department (MPD) patrol officer. While questioning L.B. the Officer became suspicious of her age due to inconsistencies in L.B.'s initial answers to the Officer's questions.  Upon further questioning, L.B. acknowledged, among other things, that she was 16 years old and that she had engaged in prostitution in variously in Washington, D.C., Virginia, and Maryland at the direction, and due to the coercion, of SIMMS.  L.B. made a telephone call to LEVAR SIMMS and asked him to come and pick her up.

When SIMMS arrived L.B. positively identified him as her pimp, and SIMMS was arrested.

    7.    L.B. stated that on or about July 15, 2006, she traveled to Washington, D.C. with SIMMS and two prostitutes, whom she knew as KIMBERLY JACKSON and DEVINA BAILEY.

    8.    L.B. met SIMMS while in Greensboro, North Carolina, in June 2006, where she was attending a concert. As L.B. was walking down a public street in Greensboro, SIMMS, who was driving a 1988 Navy Blue Ford Thunderbird, approached L.B. and asked L.B. if she needed any help. L.B. responded "No." SIMMS then told L.B. to get into the car or else he would put her into the car.

    9.    Once inside the car, SIMMS told L.B. that L.B. needed to make some money for him. When she told him she would not, SIMMS struck L.B. in the face with his hand. L.B. told SIMMS that L.B. was only 16 years old. SIMMS responded that he did not care and that she was going to make money for him.

    10.    SIMMS drove L.B. to an unknown location and locked L.B. in a windowless room for the night.

    11.    The next day SIMMS told L.B. to "make him some money." Because L.B. was concerned for her life, she told SIMMS that she would.

12. The "liquor house" in North Carolina where L.B. was held was used for drugs, alcohol, and prostitution. The building is described as a single-family dwelling, white in color, with a porch. It is generally in the area of Holden Road, or a road with a name similar to Holden Road.

13. Several of the men who were at the house were said to be related to SIMMS. Two of these men were known as "Dirt" and "Everette."

14. There were a large number of firearms in the dwelling that the men would handle.

15. In addition, there were a number of woman who appeared to be prostituting themselves in the house.

16. While in North Carolina, SIMMS sought to have L.B. prostitute herself for SIMMS financial benefit.

17. SIMMS took L.B. to a hotel in the Charlotte, North Carolina, area, where he took nude and semi-nude digital photographs of L.B. Some of the photographs taken by SIMMS of L.B. were to be used to advertize L.B. for prostitution. L.B. saw SIMMS attach the digital camera to a laptop computer and create the advertisements.

18. While in North Carolina, SIMMS required L.B. to have sexual relations with him.

19. In or about July of 2006, SIMMS, Bailey, and Jackson, drove with L.B. to the District of Columbia, in SIMMS's dark blue colored Thunderbird motor vehicle.  L.B. was not told where she was going.  Throughout the trip, L.B. was not left alone.

20. On arrival in Washington, D.C., SIMMS, Bailey, Jackson and L.B. stayed at 5011 Jay Street, N.E., Apartment #11, Washington, D.C.

21. Following her arrival in Washington, D.C., L.B. tried on two occasions to get away from SIMMS and to return to her family.  On one occasion, L.B. sought to leave the apartment at 5011 Jay Street, N.E., where she had been left with Bailey and Jackson.  L.B. became embroiled in a physical alternation with one of the women, but eventually realized she could not overcome both women and relented. Upon SIMMS's return to the apartment, SIMMS struck L.B. for having tried to leave.

22. On one occasion, following their arrival in Washington, D.C., SIMMS took L.B. to a hotel and took additional nude photographs of L.B.

23. SIMMS advertized, or caused to be advertized, with sexually alluring photographs, on www.craigslist.com for prostitution L.B.  Some of the photographs posted on the

website were taken in North Carolina and others were taken in the Washington, D.C., area.

24.  Similarly, SIMMS advertized, or caused to be advertized, with sexually alluring photographs, for prostitution on www.craigslist.com Bailey and Jackson.

25.  Resort to the website for www.craigslist.com corroborated that L.B., Bailey, and Jackson, were all being advertized, with sexually alluring photographs, for prostitution.

26.  Telephone number 301-740-0254 was attached to each of the postings for L.B.'s services on www.craigslist.com. When men would call that number seeking L.B.'s services, the cellphone associated with that number would be answered by, and prostitution "dates" for L.B. arranged through, whichever of SIMMS, Jackson, or Bailey was holding the cellphone at that moment.  L.B. was not permitted to hold the cellphone.

27.  On multiple occasions, between, on, or about, July 15, 2006 and August 14, 2006, SIMMS transported L.B. from Washington, D.C., to Virginia, with the intention that L.B. would engage in prostitution.

28.  On multiple occasions, between, on, or about, July 15, 2006 and August 14, 2006, SIMMS transported L.B. from

Washington, D.C., to Maryland, with the intention that L.B. would engage in prostitution.

29.  L.B. stated that SIMMS took L.B. from Washington, D.C., to the following locations, among others, where she was expected to engage in prostitution:

- KNIGHT'S INN, Laurel, Maryland;
- MARRIOTT or COMFORT INN, located on or about Lee-Jackson Highway in Fairfax, Virginia
- DAYS INN, College Park, Maryland
- HAMPTON INN, Fairfax, Virginia

30.  On those occasions when L.B. did, in fact, have sexual relations in exchange for money in Virginia and/or Maryland, after having been transported to Virginia and Maryland my SIMMS, SIMMS would take the resulting money from L.B., and would transport L.B. back to Washington, D.C.

31.  On August 14, 2006, L.B. was observed in the strip on Rhode Island Ave, N.W., and was approached by the Police. Eventually, L.B. provided the Police with information as to SIMMS and his pandering activities, including but not limited to SIMMS's pandering of L.B.  Thereafter, in coordination with law enforcement authorities, L.B. made a telephone call to SIMMS, requesting that SIMMS come to L.B.'s location and pick up L.B.  When SIMMS responded to

L.B.'s location, L.B. identified SIMMS to the law enforcement authorities.

32. L.B. told the Police that L.B. was being kept by SIMMS at 5011 Jay Street, N.E., Apartment #11, Washington, D.C. L.B. also told the Police that SIMMS had marijuana and cocaine in the apartment.

33. Your Affiant and detectives from MPD drove L.B. to 5011 Jay Street, N.E., Apartment #11, which L.B. positively identified the location at which she was forced to stay by SIMMS.

34. Following his arrest, a PEPCO utility bill was located in SIMMS's 1988 dark blue colored Ford Thunderbird. The utility bill was in SIMMS's name and indicated the service was had at 5011 Jay Street, N.E., Apartment #11, Washington, D.C.

35. Following SIMMS's arrest, a laptop computer, consistent with the laptop computer described by L.B. as having been used by SIMMS to create the cyber-advertisements with L.B.'s photographs, was recovered from SIMMS's 1988 Ford Thunderbird.

36. In addition, following SIMMS's arrest, approximately fifteen (15) bags of suspected marijuana were recovered from SIMMS's 1988 Ford Thunderbird.

37.  As of August 14, 2006, when L.B. last saw them, many items of L.B.'s clothing remained inside of Apartment #11 at 5011 Jay Street, N.E., Washington, D.C.

**Evidence Collected From SIMMS' 1988 Ford Thunderbird**

38.  As indicated above, following SIMMS's arrest, a search of SIMMS's 1988 Ford Thunderbird revealed, among other things, a laptop computer and a cellular telephone.

<u>The Laptop Computer</u>

39.  The laptop computer recovered from SIMMS's 1988 Ford Thunderbird is an HP Pavilion, model number, Z-D700, P/N, DN730AV, serial number CNF4381GQ8.  The laptop is silver and black with a 17" screen.

40.  Based upon your Affiant's education, training, experience, and the information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of a premises or vehicle it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.   Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.   Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.

Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

41.  Therefore, there exists probable cause to search the laptop computer described herein for photographic depictions, advertisements, electronic messages, voice messages, credit card activities, bills, statements, names, telephone numbers, addresses, monetary transactions, computer addresses, deleted information, coded information, file paths, and other electronic and/or digital and/or other data constituting evidence of and/or related to prostitution, interstate travel and/or interstate commerce and/or pandering.

The Cellular Telephone

42.  As previously indicated, a cellular telephone was recovered from SIMMS's 1988 Ford Thunderbird.  That cellular telephone is a gray-colored Boost Mobile cellular telephone, model number H65XAN6RR4BN, serial number 364KGG1YQX.

43.  Based upon your Affiant's education, training, experience, and the information related to me by agents and others, I know that pimps and prostitutes regularly utilize cellular telephones to maintain contact with each other,

store names and telephone numbers of other pimps, prostitutes and associates, and when capable, to store images of themselves or associates. Many telephones also enable the user to access the internet. (This would also enable a person to delete postings on the Internet via a telephone). As such, a cellular telephone also acts as an electronic address book and photo album. To that end, the call management features of those telephones would be accessed to collect information consistent with Attachment A. However, given the complexity of new cellular telephones and PDA telephones, it may be necessary for the telephones to be forensically examined consistent with the search of a computer.

44. Therefore, there exists probable cause to search the celluar telephone described herein for telephone numbers, names, nicknames, digital messages, voice messages, photographic depictions, telephonic communications, digital communications, addresses, and other electronic and/or digital and/or other data constituting evidence of and/or related to prostitution, interstate travel and/or interstate commerce and/or pandering.

45. Based upon the facts above, your Affiant believes, and therefore avers, that probable cause exists to believe

that LEVAR SIMMS, also known as "Var," has violated 18 U.S.C. Sections 1591, 2422, & 2423, and further, that probable cause exists to believe that evidence, fruits, and instrumentalities of those crimes, as further described in Attachment A hereto, are inside of 5011 Jay Street, N.E., Apartment #11, Washington, D.C.

<u>Search Warrants Previously Issued</u>

46. On August 16, 2006, this Court issued search warrants for (1) Apartment #11, 5011 Jay Street, N.E., Washington, D.C.; (2) the laptop computer identified in paragraph 39, above; and (3) the celluar telephone identified in paragraph 42, above.

47. On August 16, 2006, your Affiant and other law enforcement personnel executed the search warrant on Apartment #11, 5011 Jay Street, N.E., Washington, D.C., and recovered at that address, among other things, an abundance of clothing indicative of female prostitution; a list of names of males with dates, time increments, and what appear to be dollar amounts (*e.g.*, "1 hour, 250"; "1/2 hour, 150"; "weekend, 2,000 roses") that are indicative of records of interactions with male prostitution customers and indicating the customers had learned of the service through "CL" which your Affiant believes refers to "Craig's List;" hotel

receipts from hotels in North Carolina, Virginia, and Maryland; a framed photograph of a woman who had earlier been identified by the victim as being a prostitute who worked for Levar Simms in North Carolina and in the greater Washington, D.C., area, and of whom photographs appear on Craig's List offering services -- the framed photograph seized from Apartment #11 appears to be the same as one of the photographs on Craig's List.

48.  On the night of August 16, 2006, following the execution of the search warrant on Apartment #11, 5011 Jay Street, N.E., your Affiant was required to travel first to California and then to Texas on a different interstate investigation.  As a result, the earlier-issued search warrants for the above-identified laptop computer and celluar telephone could not be executed within the two-day time frame indicated on such warrants.

49.  From the time of their initial seizure, the laptop computer (identified in paragraph 39, above) and the celluar telephone (identified in paragraph 42, above) have been continuously in the custody and control of law enforcement personnel.  As a result, there is probable cause to believe that the evidence that existed in the laptop computer and

the celluar telephone on August 16, 2006 continues to exist therein today.

                                                  _____
                                                  WILLIAM R. McDERMOTT
                                                  Special Agent
                                                  Federal Bureau of Investigation

        SWORN TO and SUBSCRIBED before me on this 31th day of August, 2006, by the said Special Agent William R. McDermott.

                                                  _____
                                                  ALAN KAY
                                                  UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

<u>PROPERTY TO BE SEIZED</u>

The items to be seized are:

1. Any books, ledgers, records, receipts, notes, or other papers relating to prostitution, whether stored electronically or otherwise;

2. Any financial books, records, receipts, statements, ledgers, records or receipts related to wire transfers, or financial documents, whether stored electronically or otherwise;

3. Any and all address books, phone books, and lists of names and addresses, whether stored electronically or otherwise;

4. Any indicia of ownership or occupancy of the premises described in Attachment B;

5. Any computers and magnetic/optical storage devices and media, including, but not limited to: laptop and desktop computers, PDAs, floppy discs, CDs and DVDs, hard drives, zipdrives, and thumb drives;

6. Any photography or video equipment;

7. Any equipment used to make fraudulent identifications, including but not limited to: printers, card "blanks," magnetic stripe readers and magnetic stripe programmers;

8. Any records, including but not limited to: birth certificates, vital records, and identification cards or drivers licenses of third parties not living at the residences;

9. Any clothing or wigs, or receipts/records reflecting the purchase of clothing or wigs, consistent with the prostitution industry, including, but not limited to g strings, lingerie, and body stockings;

      10.  Any photographs of co-conspirators, victims, clients, customers, assets, or contraband, whether stored electronically or otherwise;

      11.  Any currency, securities, precious metals or jewelry, money orders, or commercial paper relating to the proceeds of prostitution;

      12.  Any travel documents, including, but not limited to: transportation tickets, travel receipts, itineraries, and confirmation letters;

      13.  Any records, stored electronically or otherwise, relating to income or income tax records;

      14.  Any cellular telephones, telephone records, telephone books or lists, or receipts relating to the acquisition and purchase of cellular telephones or telephone service;

      15.  Any receipts, room keys, or other information regarding the rental or use of hotels;

      16.  Any receipts or documentation pertaining to the rental or leasing of automobiles; and

      17.  Any firearms.

**ATTACHMENT B**

<u>ITEMS TO BE SEARCHED</u>

The two items to be searched are:

1. One A HP Pavilion, model number, MD Z-D700, P/N, DN730AV and Serial number CNF4381GQ8. The computer is 17" and is grey and black in color.

2. One Boost Mobile cellular phone, model number H65XAN6RR4BN, serial number 364KGG1YQX. The cellular telephone is generally grey in color.